UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | |
|---|---|
| BREEDERS' CUP LIMITED, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | No. 5:19-cv-00113-GFVT |
| ) | |
| V. ) | **MEMORANDUM OPINION** |
| ) | **&** |
| NUVEI TECHNOLOGIES, INC., ) | **ORDER** |
| ) | |
| Defendant. ) | |
| ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on cross-motions for summary judgment filed by the Parties. [R. 56; R. 60.] Breeders' Cup and Pivotal Payments (now known as Nuvei Technologies) entered into a Sponsorship Agreement that allowed Pivotal to advertise itself as the "Official Credit Card Processor of the Breeders' Cup." When Churchill Downs used Ticketmaster to process credit cards for ticket sales to the 2018 Breeders' Cup World Championships, Pivotal exited the contract, and Breeders' Cup sued. Pivotal now argues that official should mean exclusive. But the Sponsorship Agreement granted no right whatsoever for Pivotal to process ticket sale transactions, whether exclusively or officially. Accordingly, Pivotal breached the contract and had no right to exit the deal. Breeders' Cup's Motion for Summary Judgment **[R. 60]** is **GRANTED** in part, and Pivotal's Motion for Summary Judgment **[R. 56]** is **DENIED** in part.

# I

The Breeders' Cup hosts the World Championships of Thoroughbred racing. [R. 56-2 at 2.] Influential and wealthy competitors, corporate partners, and spectators gather each year at a different racetrack to attend the two-day event. *See id.* at 2–3. Through ticket sales, the races generate significant revenue. [R. 58 at 8; R. 65 at 6.]

Pivotal Payments, Inc., provides credit card processing services. [R. 1-1 at 6.] When Pivotal handles a transaction for a client, it receives a small fee. [R. 58 at 13; *e.g.*, R. 11-1 at 3 (establishing a fee of cost plus 0.25%).] Seeking to expand its business, Pivotal negotiated a relationship with Breeders' Cup. [R. 58 at 2; R. 65 at 1–2.] Whether the relationship included the right to process ticket sales for the World Championships is the key issue in this litigation. [R. 58 at 3; R. 61-1 at 4.]

The parties ultimately memorialized this relationship in a Sponsorship Agreement executed on October 2, 2014. [R. 58 at 2; R. 61-1 at 2; *see also* R. 61-2 (the document).] The contract required Pivotal to pay Breeders' Cup Limited a royalty of $40,000 per year and to pay Breeders' Cup Properties $35,000 per year as "a digital and hospitality fee." [R. 61-2 at 4 ¶¶ 3(a)–(b).] During four of the later years of the contract, Pivotal also agreed to increase these amounts if it processed over $5,000,000 in credit card fees for Breeders' Cup. *Id.* ¶ 3(c).

In exchange, Breeders' Cup agreed to several promotional partnerships with Pivotal. Breeders' Cup allowed Pivotal to use its trademarks and logos in its advertising, to call itself the "Official Credit Card Processor of the Breeders' Cup," and to use archived footage of Breeders' Cup races in its advertising. *Id.* at 2–3 ¶ 1(a). The contract required Breeders' Cup to identify Pivotal as a presenter during a cocktail hour the week of the Championship races. *Id.* at 3 ¶ 1(b). Breeders' Cup also agreed to send a co-branded marketing email to some of its clients, to

2

mention Pivotal on its website, and to provide Pivotal with eight tickets to its events each year *Id.* ¶ 2.

In addition to these promotional benefits, Breeders' Cup Properties agreed to simultaneously enter into a "merchant processing arrangement" with Pivotal. *Id.* at 5 ¶ 4. The parties agreed that this Merchant Agreement would pay Pivotal a fee "equal to interchange and assessment plus Twenty-Five (25) basis points . . . ." *Id.* Both Pivotal and Breeders' Cup agree that this clause of the Sponsorship Agreement lacks an explicit reference to the processing of ticket sales. [R. 58 at 3; R. 61-1 at 6.]

Before signing the Sponsorship Agreement in October, Breeders' Cup agreed to three Merchant Agreements. In July 2014, Breeders' Cup Limited allowed Pivotal to process payments for Breeders' Cup Nominations. [R. 61-1 at 2 n.4; R. 60-2 at 3.] In August of 2014, the Breeders' Cup Betting Challenge and Breeders' Cup Charities followed suit and permitted Pivotal to process payments that they received. [R. 61-1 at 2 n.4; R. 60-3 at 3; R. 60-4 at 3.]

Through the course of four World Championships, the parties enjoyed their relationship. In the fall of 2014, Pivotal's executives attended the World Championships, Breeders' Cup advertised Pivotal as its "Official Credit Card Processor" on its website, and the parties collaborated to craft a press release describing an "[e]xclusive payment processing agreement" for Pivotal "to handle online and in-person ticketing . . . ." [R. 60-11 at 7; R. 60-12; R. 56-3 at 14.] The same year, Pivotal inked its first deal to process credit card fees for tickets sales with one of the racetracks that host the World Championships. [R. 56-19 at 3.]

In September of 2014, the Keeneland Association, Inc., signed a Merchant Agreement and permitted Pivotal to process "admissions tickets" for the 2015 World Championships, which it would host. *Id.* The host of the 2016 World Championships, Santa Anita, followed suit. [R.

3

56-20 at 3.] And Del Mar eventually signed a Merchant Agreement for online ticket sales for the 2017 event. [R. 56-21 at 3.]

The snag came when Churchill Downs, the site for the 2018 races, did not utilize Pivotal. [R. 58 at 11–12; R. 61-1 at 7–8.] Churchill Downs had an exclusive contract with Ticketmaster. [R. 61-1 at 8.] In the fall of 2018, Pivotal notified Breeders' Cup that it intended to terminate the Sponsorship Agreement. [R. 58 at 13; R. 61-1 at 9.] Pivotal argues that, by failing to ensure that Pivotal processed the 2018 ticket sales, Breeders' Cup breached the contract and justified Pivotal's exit. [R. 58 at 12.] For its part, Breeders' Cup believes Pivotal concluded that the Sponsorship Agreement was not profitable and looked for an excuse to get out of it. [R. 65 at 10.] Regardless, Pivotal neither made its payment under the contract in the fall of 2018, nor any of the remaining payments. [R. 61-1 at 3, 10.]

Breeders' Cup sued Pivotal in Fayette Circuit Court, claiming breach of contract, unjust enrichment, and breach of the implied covenant of good faith and fair dealing. [R. 1-1 at 15–16.] Pivotal removed the case to federal court and brought counterclaims against Breeders' Cup for breach of the Sponsorship Agreement, breach of the Merchant Agreements, breach of the implied duty of good faith and fair dealing, and a request that the Court declare that it was entitled to terminate the Sponsorship Agreement. [R. 1; R. 10 at 13–16.] Both parties moved for summary judgment, and the matter is now ripe for review.[1] [R. 56; R. 60.]

**II**

Federal courts grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, some factual disputes between the parties do not prevent summary

---

[1] An unredacted copy of Pivotal's motion is located at [R. 58]. Likewise, an unredacted copy of Breeders' Cup's motion may be found at [R. 61-1].

4

judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). Only facts that affect the outcome of the suit under the governing law preclude the entry of summary judgment. *Id.* at 249. The facts must also be genuine in that, if proven at trial, a reasonable jury could rely on them to return a verdict for the non-moving party. *Id.*

To be disputed, a party need not prove a material fact conclusively, but the non-moving party must present sufficient probative evidence to require a judge or jury to resolve the matter at trial. *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968). A court construes the evidence in the light most favorable to the non-moving party. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425, 427 (6th Cir. 1962).

The summary judgment standard does not change because a court faces cross-motions for summary judgment. *Profit Pet v. Arthur Dogswell, LLC*, 603 F.3d 308, 312 (6th Cir. 2010) (citing *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)). Cross-motions do not require a court to grant judgment as a matter of law for one party or the other. *Id.* Rather, a court must consider the merits of each motion and take care to draw all reasonable inferences against the party whose motion is under consideration. *Id.*

**A**

This contest turns on whether Pivotal held a contractual right to service credit card payments for tickets to the 2018 World Championships. If it did not, then Breeders' Cup did not breach its obligations, and none of Pivotal's defenses can succeed. Yet Pivotal does not allege that an enforceable written or oral contract explicitly grants it the right to process these ticket transactions. Instead, its claim is that the Court should interpret the Sponsorship Agreement to include that right.

5

The parties agree that Kentucky law governs their claims. [*See* R. 58 (applying Kentucky law); R. 61-1 at 12 (same).] Under Kentucky law, the interpretation of a contract is generally a question of law for the court to decide. *Guagenti v. James N. Gray Co.*, 105 Fed. App'x 717, 720 (6th Cir. 2004) (citing *Morganfield Nat'l Bank v. Damien Elder & Sons*, 836 S.W.2d 893, 895 (Ky. 1992)). To interpret a contract, "Kentucky Courts seek to determine the intention of the parties according to the language of the contract." *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 564 (6th Cir. 2008). A court must construe a contract as a whole, giving effect to all parts and every word in it if possible. *Howard v. Mercer Transp. Co.*, No. 3:12-cv-00750-CRS-DW, 2013 U.S. Dist. LEXIS 1389066, at *5 (W.D. Ky. Sep. 24, 2013) (citing *Island Creek Coal Co. v. Wells*, 113 S.W.3d 100, 103 (Ky. 2003)). That said, the clear and unambiguous language of a written instrument controls, and neither party can attempt to rewrite it. *Id.* (citing *Consol. Jewelers, Inc. v. Standard Fin. Corp.*, 325 F.2d 31 (6th Cir. 1963)).

Unless a contract is ambiguous, a court must strictly construe the written document by its own terms in accordance with the words' ordinary meaning. *Frear v. P.T.A. Indus.*, 103 S.W.3d 99, 106 (Ky. 2003). To do so, the court reviews the contents set forth within the contract's four corners. *Cantrell Supply, Inc. v. Liberty Mut. Insu. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002). A court will only consider parole and extrinsic evidence after determining that a provision is ambiguous. *Id.* Otherwise, evidence involving the circumstances surrounding the execution of the contract, its subject matter, and the conduct of the parties is irrelevant. *Id.*

"A contract is ambiguous if a reasonable person would find it susceptible to different or inconsistent interpretations." *Id.* A court cannot create ambiguity where none exists. *S. Comfort Waterbeds & Spas, Inc. v. Master Spas, Inc.*, No. 3:02-cv-644-S, 2004 U.S. Dist. LEXIS 24288, at *5 (W.D. Ky. Aug. 9, 2004) (citing *Frear*, 103 S.W.3d at 106). Nor can a party create

6

ambiguity by asserting, after the fact, that the contract failed to state what was truly intended. *Id.* As a question of law, the Court decides whether a contract is ambiguous. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 563 (6th Cir. 2008) (citing *Abney v. Nationwide Mut. Ins. Co.*, 215 S.W.3d 699, 703 (Ky. 2006)). Simply put, a matter of contract interpretation does not go to the jury unless reasonable alternative interpretations exist. *Colvin v. Magnum Drilling of Ohio, Inc.*, No. 90-6369, 1991 U.S. App. LEXIS 10758, at *6 (6th Cir. May 15, 1991) (citing *Cook United Inc. v. Waits*, 512 S.W.2d 493, 495 (Ky. 1974)).

Pivotal must show that it was entitled to process credit card transactions for tickets to the 2018 World Championships. [*See* R. 58 at 16 ("The ultimate issue in this case is whether Pivotal had the right to process ticket sales for the 2018 World Championships.").] Pivotal believes that the Merchant Agreement clause creates that right. *Id.* at 3. It argues that the clause is ambiguous as to the nature and quantity of processing arrangements that Breeders' Cup committed to provide Pivotal. *Id.* at 17. So, Pivotal asks the Court to consider a mountain of extrinsic evidence to infer an exclusive right to process Breeders' Cup ticket sales where no explicit grant of that right exists. *Id.* at 18–19.

By contrast, Breeders' Cup contends that the Merchant Agreement clause is unambiguous. [R. 61-1 at 11–12.] Nowhere in the Sponsorship Agreement, its Merchant Agreement clause, or the Merchant Agreements into which the parties entered is there any reference to a right to process ticket sales. *Id.* Breeders' Cup believes that Pivotal is asking to enforce a right that it never received.

1

Under the plain language of the Merchant Agreement Clause, Breeders' Cup agreed to simultaneously enter into a "merchant processing arrangement." No more, no less. The contract

states that "BC Properties shall simultaneously enter into a merchant processing arrangement (the 'Merchant Agreement') with Pivotal Payments . . . ." [R. 61-2 at 5.] It requires the Merchant Agreement to last as long as the Sponsorship Agreement. *Id.* And it requires Pivotal to receive a fee "equal to interchange and assessment plus Twenty-Five (25) basis points . . . ." *Id.*

Prior to signing the Sponsorship Agreement, Pivotal and Breeder's Cup agreed to three Merchant Agreements. In July of 2014, Breeder's Cup Limited consented to a Merchant Agreement on a standardized form prepared by Pivotal. [R. 60-2 at 3.] The parties estimated that Pivotal would handle an average monthly volume of $250,000 in nomination fees, for which Pivotal would charge "cost plus" "0.25%." *Id.* at 4. Breeder's Cup Challenge signed the same form in August for registration fees, with Pivotal again to receive "cost plus" ".25%" to process an average monthly volume of $80,000 in registration fees. [R. 60-3 at 3–4.] The same day, Breeder's Cup Charities endorsed an identical form, with Pivotal to earn "cost plus" ".25%" to process an estimated $3,000 per month in payments. [R. 60-4 at 3–4.] The parties executed the Sponsorship Agreement containing the Merchant Agreement Clause in October. [R. 61-2 at 5, 13.]

Under Kentucky law, "agreements sufficiently related should be integrated, or at least construed together." *Hosp. of Louisa v. Sergent*, No. 0:10-cv-9-HRW-REW, 2012 U.S. Dist. LEXIS 203503, at *33 (E.D. Ky. 2012). Contracts are construed holistically, "and all writings that are part of the same agreement are construed together." *ABCO-BRAMER, Inc. v. Market Ins. Co.*, 55 S.W.3d 841, 845 (Ky. Ct. App. 2000). Thus, "[a] new contract with reference to the subject-matter of a former one does not supersede the former and destroy its obligations, except

8

in so far as the new one is inconsistent therewith . . . ." *Menefee v. Rankins*, 164 S.W. 365, 365 (Ky. 1914).

Accordingly, courts applying Kentucky law read multiple documents as part of an overall contract if they are executed close in time and they clarify each other's terms without creating conflict. *See Poundstone v. Patriot Coal Co.*, 485 F.3d 891, 897 (6th Cir. 2007); *see also Fidelity & Columbia Trust Co. v. Schmidt*, 53 S.W.2d 713, 718 (1932) ("Two or more written instruments between the same parties, executed simultaneously, referring to each other, and concerning a single transaction, must be construed together as constituting the contract between the parties."). "[R]eference to a prior writing may be essential to the interpretation and construction of a later contract when, even though the writings in question were neither executed at the same time, nor made by the same parties, the multiple writings are so clearly and closely related to the same transaction that the meaning of the later writing, at the time when and the place where it was made, can only be understood by referring to the earlier writing." 11 Williston on Contracts § 30:26 (4th ed.).

Courts interpret these agreements together to determine whether ambiguity exists before reviewing any evidence outside of the four corners of the contract. *See Mostert v. Mostert Grp., LLC*, 606 S.W.3d 87, 92–93 (Ky. 2020) ("Faced with two contracts executed by the parties simultaneously, we look to the language employed in those contracts. . . ."). Where the writings define a term, external definitions offered by a party are immaterial. *See id.* at 93.

Read together, the three Merchant Agreements and the Sponsorship Agreement's Merchant Agreement clause unambiguously refer to each other. The Sponsorship Agreement refers to a "Merchant Agreement" into which the parties will "simultaneously enter." [R. 61-2 at 5.] All three of the Pivotal application forms signed by Breeder's Cup define a "Merchant

9

Agreement" as "this Merchant Application once approved . . . together with the Terms and Conditions . . . ." [R. 60-2 at 3; R. 60-3 at 2; R. 60-4 at 3.]  Given that no other Merchant Agreements between a Breeders' Cup entity and Pivotal exist, the only logical reading of the phrase "simultaneously enter into a merchant processing arrangement (the 'Merchant Agreement')" is to refer to the three Merchant Agreements that the parties signed as part of their negotiations.[2]  [R. 61-2 at 5.]

**2**

Pivotal disagrees for several reasons.  First, it argues that the term "arrangement" "undisputedly suggests more than one agreement." [R. 68 at 15.]  Pivotal believes that the reference to an arrangement is ambiguous as to whether the Merchant Agreement clause might extend to future agreements, including an opportunity for Pivotal to process ticket sales for the 2018 World Championships.  *Id.*  But that construction would violate the basic contract law principle that a court must give preference to an "'interpretation which gives a reasonable, lawful, and effective meaning to all the terms' over a reading 'which leaves a part unreasonable, unlawful, or of no effect.'" *Maze v. Bd. of Dirs. for the Commonwealth Postsecondary Educ. Prepaid Tuition Tr. Fund*, 559 S.W.3d 354, 363 (Ky. 2018) (quoting *Comstock & Co., Inc. v. Becon Constr. Co.*, 932 F. Supp. 948, 967 (E.D. Ky. 1994))  Subjecting future contracts to the Merchant Agreement clause would render the term "simultaneous" a nullity.  The better reading is to limit the Merchant Agreement clause to arrangements made while the parties were

---

[2] Early in this litigation, Pivotal agreed.  As it explained at the time, "'Merchant Agreement' means this Merchant Application . . . together with the Terms and Conditions of the Merchant Agreement found at www.pivotalpayments.com/MA." [*See* R. 11 at 2 ¶ 5; R. 11-1 at 2.] Pivotal made this argument in its Motion to Transfer Venue. [R. 11 at 2.] It argued that the terms and conditions referenced in the Merchant Agreement contained a forum-selection clause mandating that this litigation occur in New York. *Id.* at 2–3.  The Court refused to transfer the litigation to New York for several reasons, including the Sponsorship Agreement's choice of Kentucky law. [R. 27 at 7.] Unlike the issue with the forum selection clause, there is nothing in the Sponsorship Agreement that conflicts with defining the term "Merchant Agreement" as referring to the three Merchant Agreements that the parties signed.

10

negotiating the Sponsorship Agreement. The terms of the Sponsorship Agreement simply did not contemplate a future agreement to be made on an unknown date.

Next, Pivotal argues that the Merchant Agreement clause is ambiguous because it omits several material terms. [R. 68 at 16.] Pivotal suggests that, without extrinsic evidence, it is impossible to know "(1) how many merchant agreements were needed to fulfill the obligation . . . (2) what payments would be processed . . . or even (3) which entity would enter into each merchant agreement." *Id.* The three forms that Breeders' Cup signed supply that information. For example, the Nominations Merchant Agreement specifies that Pivotal will process approximately $250,000 per month in "Nomination Eligibility Payments." [R. 60-2 at 3.] It names Breeders' Cup Limited as the entity subject to the agreement. *Id.* And the three Merchant Agreements together demonstrate that the parties contemplated a total of three arrangements that would fulfill the obligation. *Id.*; [R. 60-3; R. 60-4.]

Pivotal also believes that the Sponsorship Agreement's designation of "BC Properties" as the entity required to enter into a Merchant Agreement renders the clause ambiguous. [R. 68 at 16; R. 61-2 at 5.] Pivotal's premise is correct. Breeders' Cup Limited, Breeders' Cup Betting Challenge, and Breeders' Cup Charities, not Breeders' Cup Properties, are the entities listed on the Merchant Agreement forms. [R. 60-2 at 3; R. 30-3 at 3; R. 60-4 at 3.] But Pivotal's conclusion goes too far. As Breeders' Cup points out, the Sponsorship Agreement defines the parties to the contract as "Pivotal Payments" and "the BC Parties." [R. 73 at 11.] The "BC Parties" include both Breeders' Cup Properties and Breeders' Cup Limited. [R. 61-2 at 2.] Breeders' Cup suggests that the reference to "BC Properties" is a typo intended to mean "BC Parties." [R. 73 at 11.]

11

Scrivener's errors in contracts do not vitiate their effect so long as the document's fair intent can be discerned from the whole text. *Commonwealth v. Kerr*, 136 S.W.3d 783, 785 (Ky Ct. App. 2004). Moreover, where parties to a contract treat related entities collectively, one entity can step into the shoes of another to enforce that contract. *See Palazzo v. Fifth Third Bank*, No. 2011-CA-000034-MR, 2012 Ky. App. Unpub. LEXIS 585, at *7 (Ky. Ct. App. Aug. 17, 2012) (citing *Kruse v. AFLAC Intern., Inc.*, 458 F. Supp. 2d 375, 383 (E.D. Ky. 2006)) (Fifth Third Bank could enforce an arbitration agreement signed by Fifth Third Securities where the parties referred to them collectively). The Sponsorship Agreement defines Breeders' Cup Properties and Breeders Cup Limited collectively as a single party. [R. 61-2 at 2.] That choice shows that Pivotal understood them to be interchangeable. Indeed, Pivotal acknowledges that it "always understood that the Sponsorship Agreement did not require a particular party to enter into any merchant agreements." [R. 68 at 16]; *c.f. Palazzo*, 2012 Ky. App. Unpub. LEXIS 585, at *6 ("[I]n her complaint, [plaintiff] treats Fifth Third Securities and the Bank as one entity – 'Fifth Third.'"). The Merchant Agreement clause gives no reason to indicate that specific performance by Breeders' Cup Properties would be required to the exclusion of other Breeders' Cup entities. Accordingly, a related Breeders' Cup entity could fulfill the obligation created by the Merchant Agreement clause, without rendering the contract ambiguous.

### 3

Ultimately, the Sponsorship Agreement and the three Merchant Agreements, read together, created an obligation for Breeders' Cup to permit Pivotal to process "Nomination Eligibility Payments," "Registration Fee[s]," and payments to "Breeders' Cup Charities" for the length of the term of the Sponsorship Agreement for a fee "equal to interchange and assessment plus Twenty-Five (25) basis points." [R. 61-2 at 5; R. 60-2 at 3–4; R. 60-3 at 3–4; R. 60-4 at 3–

4.] The arrangement unambiguously did not include ticket sales. Pivotal cannot create ambiguity on this point by claiming, after the fact, that the contract did not state what the parties truly intended. *See S. Comfort Waterbeds*, 2004 U.S. Dist. LEXIS 24288, at *5.

**B**

So, given the lack of ambiguity, what now? The Court cannot consider any of Pivotal's arguments regarding extrinsic evidence and course of performance. *Cantrell Supply*, 94 S.W.3d at 385. Indeed, all the extrinsic evidence is irrelevant to summary judgment because it is not material to the outcome of this litigation. *Liberty Lobby*, 477 U.S. at 248–49.

Breeders' Cup asks for summary judgment on its breach of contract claim because Pivotal stopped making its annual payment in 2018. [R. 61-1 at 3; R. 73 at 14.] Pivotal argues that it did not have to make that payment either because it validly terminated the contract or because Breeders' Cup committed the first breach by not ensuring that Pivotal processed the payments for the 2018 World Championships. [R. 68 at 20–21.] Both of these defenses are premised on the existence of a contractual right to process payments for the 2018 event. *See id.* Because the contract unambiguously did not grant Pivotal that right, there is no longer a material dispute on whether Pivotal breached. Pivotal breached the Sponsorship Agreement when it failed to pay in 2018.

Several issues remain. Because of the centrality of contract interpretation to this litigation, the parties devoted most of their briefing to the issue of breach. Breeders' Cup also brought claims for unjust enrichment and breach of the implied covenant of good faith and fair dealing. [R. 1-1 at 15–16.] Likewise, in addition to its claims for breach of contract, Pivotal counterclaimed for breach of the implied duty of good faith and fair dealing and a request for a declaratory judgment. [R. 10 at 13–16.] The Parties provided scant opinions on the appropriate

13

path forward on these claims in the event of a Breeders' Cup victory regarding breach. Before the Court rules on the cross-motions for summary judgment, it will permit the Parties to brief the remaining claims in light of the Court's ruling.

### III

Justice Scalia once wrote that Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). The same reasoning applies to Breeders' Cup and Pivotal. If the parties had intended their contract to cover the Breeders' Cup's biggest cash cow, they would have included an exclusive grant of the right to process ticket sales for the World Championship in the contract. They would not have hidden consideration of that enormity in an ambiguous term. Regardless, the terms memorialized in the contract control. The contract says nothing about ticket sales for the World Championship. The Court will not read an elephant into this mousehole.

Accordingly, for these reasons, it is hereby **ORDERED** as follows:

1. Plaintiff Breeders' Cup's Motion for Summary Judgment **[R. 60]** is **GRANTED** in part to the extent that it is consistent with this Opinion;

2. Defendant Nuvei Technologies's Motion for Summary Judgment **[R. 56]** is **DENIED** in part to the extent that it is inconsistent with this Opinion; and

3. The Parties **SHALL** submit simultaneous briefing on the appropriate disposition for the remaining claims in this case in light of the Court's ruling within twenty-one days of the entry of this Order.

14

This the 20th day of June 2023.

Gregory F. Van Tatenhove
United States District Judge