UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| BREEDERS' CUP LIMITED, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 5:19-cv-00113-GFVT |
| | ) | |
| V. | ) | |
| | ) | **MEMORANDUM OPINION** |
| NUVEI TECHNOLOGIES, INC., | ) | **&** |
| | ) | **ORDER** |
| Defendant. | ) | |
| | ) | |

**\*\*\*   \*\*\*   \*\*\*   \*\*\***

This matter is before the Court on a Motion to Reconsider filed by Defendant Nuvei Technologies, formerly known as Pivotal Payments. [R. 80.] The Court previously held that Pivotal breached a contract with Plaintiff Breeders' Cup. [R. 78.] Pivotal believes the agreement granted it the right to process credit card transactions for the Breeders' Cup World Championships. Inconveniently, the text of the contract says nothing about ticket sales, so the Court concluded that Pivotal simply did not have any entitlement to process them. Now, Pivotal asks the Court to reconsider that decision, arguing that whenever a contract is silent on a vital matter, Kentucky law requires courts to consider extrinsic evidence. Because ticket processing was not a vital matter to the parties' express rights under the agreement, its Motion for Reconsideration **[R. 80]** is **DENIED**.

**I**

The Breeders' Cup hosts the World Championships of thoroughbred racing. [R. 56-2 at 2.] Competitors, corporate partners, and spectators gather each year at a different racetrack to attend the two-day event. *See id.* at 2–3. Through ticket sales, the races generate significant revenue. [R. 58 at 8; R. 65 at 6.]

Pivotal provides credit card processing services. [R. 1-1 at 6.] When Pivotal handles a transaction for a client, it receives a small fee. [R. 58 at 13; *e.g.*, R. 11-1 at 3 (establishing a fee of cost plus 0.25%).] Seeking to expand its business, Pivotal negotiated a Sponsorship Agreement with Breeders' Cup. [R. 58 at 2; R. 65 at 1–2.] The contract required Pivotal to pay Breeders' Cup Limited a royalty of $40,000 per year and to pay Breeders' Cup Properties $35,000 per year as "a digital and hospitality fee." [R. 61-2 at 4 ¶¶ 3(a)–(b).] During four of the later years of the contract, Pivotal also agreed to increase these amounts if it processed over $5,000,000 in credit card fees for Breeders' Cup. *Id.* ¶ 3(c).

In exchange, Breeders' Cup agreed to several promotional partnerships with Pivotal. Breeders' Cup allowed Pivotal to use its trademarks and logos in its advertising, to call itself the "Official Credit Card Processor of the Breeders' Cup," and to use archived footage of Breeders' Cup races in its advertising. *Id.* at 2–3 ¶ 1(a). The contract required Breeders' Cup to identify Pivotal as a presenter during a cocktail hour the week of the Championship races. *Id.* at 3 ¶ 1(b). Breeders' Cup also agreed to send a co-branded marketing email to some of its clients, to mention Pivotal on its website, and to provide Pivotal with eight tickets to its events each year *Id.* ¶ 2.

Nothing in the Sponsorship Agreement requires Breeders' Cup to use Pivotal to process credit card fees for ticket sales to the World Championships. [*See* R. 61-2.] Nevertheless, Keeneland, Santa Anita, and Del Mar agreed to allow Pivotal to process these sales when they hosted the event. [R. 56-19 at 3; R. 56-20 at 3; R. 56-21 at 3.] In 2018, Churchill Downs did not. [R. 58 at 11–12.; R. 61-1 at 7–8.]

That fall, Pivotal ceased making payments under the contract, claiming that Breeders' Cup breached the deal by failing to secure Churchill Downs's participation. [R. 58 at 13; R. 61-1

2

at 9.]  Breeders' Cup sued, and Pivotal counterclaimed, continuing to argue that it had a right to be the exclusive processor of ticket sales for the World Championships.  [R. 1-1 at 15–16; R. 10 at 13–16.]  Because the contract failed to explicitly grant that right, Pivotal relied on extrinsic evidence to support its claims.  [R. 78 at 13.]

The Court disagreed with that decision.  Because "[t]he arrangement unambiguously did not include ticket sales[,] Pivotal cannot create ambiguity on this point by claiming, after the fact, that the contract did not state what the parties truly intended."  *Id.*  The Court declined to consider extrinsic evidence and held that Pivotal breached the Sponsorship Agreement.  *Id.*  Pivotal asks the Court to reconsider that decision.  [R. 80.]

## II

A federal district court has the authority to reconsider interlocutory orders under both the common law and Federal Rule of Civil Procedure 54(b).  *Rodriguez v. Tenn. Laborer's Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004).  Traditionally, courts only reconsider interlocutory orders "when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice."[1]  *Id.*  A motion to reconsider an interlocutory order is not an invitation for the parties to relitigate the issue.  *See Hazard Coal Corp. v. Am. Res. Corp.*, Civil No. 6:20-cv-00010-CHB, 2022 U.S. Dist. LEXIS 238150, at *15 (E.D. Ky. Sep. 9, 2022).  These motions do not permit parties to raise arguments or to present evidence that was available to them at the time of summary judgment.

---

[1] That said, district courts have the power to revisit their interlocutory summary judgment decisions "for any reason."  *ACLU of Ky. v. McCreary Cnty.*, 607 F.3d 439, 450 (6th Cir. 2010); *see also Dayton Veterans Residences Ltd. P'ship v. Dayton Metro. Hous. Auth.*, No. 21-3090, 2021 U.S. App. LEXIS 34511, at *15–17 (6th Cir. Nov. 19, 2021) (discussing the *Rodriguez* factors but noting that, under *ACLU of Kentucky*, district courts have authority to reconsider summary judgment for reasons outside those factors).

*Energy Ala. v. TVA*, No. 2:20-cv-02615, 2022 U.S. Dist. LEXIS 184826, at *4 (W.D. Tenn. July 14, 2022).

Pivotal argues that the Court committed clear error by failing to consider extrinsic evidence to determine whether it had a contractual right to process ticket payments for the 2018 World Championships.  [R. 80 at 1–2.]  It argues that the Court ignored Kentucky caselaw on contracts that are "silent on a vital matter." *Id.*  Pivotal raised this argument prior to the Court's ruling on summary judgment.  [R. 68 at 17; R. 75 at 8–9.]  And the Court did not ignore it. Instead, it concluded that the right to process ticket sales was not a "vital matter" as contemplated by the cases.

Under Kentucky law, construction of a contract turns on the intent of the parties.  *3D Enters. Contracting Corp. v. Louisville & Jefferson Cnty. Metro. Sewer Dist.*, 174 S.W.3d 440, 448 (Ky. 2005).  Unless a contract is ambiguous, that intent must be "discerned from the four corners of the instrument without resort to extrinsic evidence." *Harper v. Oversight Comm. (in re Conoco, Inc.*), 855 F.3d 703, 709 (6th Cir. 2017) (citing *Hoheimer v. Hoheimer*, 30 S.W.3d 176, 178 (Ky. 2000)).  "Where a contract is ambiguous or silent on a vital matter, a court may consider parol and extrinsic evidence involving the circumstances surrounding execution of the contract, the subject matter of the contract, the objects to be accomplished, and the conduct of the parties." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. 2002). Generally, courts only permit silence to pierce the ban on extrinsic evidence if "it involves a matter naturally within the scope of the contract."  11 Williston on Contracts § 30:4 (4th ed. 2023).

Kentucky decisions illustrate this principle.  In *Ranier*, the Kentucky Supreme Court considered inequitable behavior by a bank.  *See Ranier v. Mount Sterling Nat'l Bank*, 812

S.W.2d 154, 155 (Ky. 1991).  Phyllis Ranier loaned $200,000 to Algin and Doris Nolan to buy a house, secured by a note in favor of Ms. Ranier.  *Id.*  When the Nolans wanted to remodel, Ms. Ranier agreed to subrogate her security interest in the property to a $125,000 mortgage lien held by Mount Sterling National Bank.  *Id.*  The mortgage included a future advance clause that capped the total indebtedness at $125,000.  *Id.*  Later, without notifying Ms. Ranier, Mount Sterling issued a renewed note to the Nolans for a total of $200,000, with $125,000 secured to the extent of the first mortgage and $75,000 unsecured.  *Id.*

Over time, the Nolans made payments and Mount Sterling chose to apply them to the unsecured portion of the note.  *Id.*  When the Nolans quit paying, Mount Sterling foreclosed, claimed first priority, and left Ms. Ranier with a pittance.  *Id.*  Ms. Ranier sued and argued that the spirit of her subrogation agreement, by which she abandoned her position of first priority to make room for no more than $125,000, required Mount Sterling to apply the payments first to the original, secured indebtedness.  *Id.*

The Kentucky Supreme Court held that Mount Sterling breached the implied duty of good faith inherent in the subrogation agreement.  *See id.*  In so doing, the Court observed that "[w]hen a contract is silent with respect to a matter vital to the rights of the parties, a court, in construing it, is necessarily compelled to resort to a consideration of the surrounding circumstances and the conduct of the participants indicating their interpretations."  *Id.* at 156 (quoting *Caudill v. City of Maysville*, 178 S.W.2d 945, 946 (Ky. 1944)).  While the subrogation agreement expressly stated that the Nolans "would borrow a total of $125,000," it did not explicitly prohibit Mount Sterling from lending them more money, nor did it contain provisions governing how the bank should credit any payments that it received.  *Id.* at 155–56.  The contract's inclusion of language that abandoned Ms. Ranier's position of priority to a maximum

5

amount implied a "good faith belief that her mortgage would be subordinated only to the extent of $125,000 . . . ." *Id.* at 156.

Likewise, a right to remove scrap metal expressed in a written contract implied an obligation to repair damage incurred during removal in *Caudill v. City of Maysville*, 178 S.W.2d 945 (Ky. 1944). William Caudill won an auction for scrap metal remaining from the construction of railways in Maysville, Kentucky. *Id.* at 945. Some years after Mr. Caudill removed the material that was readily movable, the city removed the remaining rails, which were embedded up to five inches in the city streets. *Id.* When the city sold the removed metal, Mr. Caudill sued, claiming that he owned the material by virtue of his accepted bid. *Id.* Kentucky's court of last resort upheld a jury instruction that deducted the city's removal cost from the market value of the rails. *Id.* Although Mr. Caudill pointed to the contract's silence on who bore the cost of removal, the court held that the amount of money accepted by the city in Mr. Caudill's bid, which was less than the cost of removal, implied that it expected Mr. Caudill to remove the rails. *Id.* at 946.

Other courts have applied Kentucky law in a similar manner. In *Abell v. Sky Bridge Resources, LLC,* the Sixth Circuit considered extrinsic evidence to determine whether an employment contract compensated contractors at full or half pay for travel time. *Abell v. Sky Bridge Res., LLC,* 715 F. App'x 463, 470 (6th Cir. 2017). The employment agreement explicitly required "all hours worked" to be compensated at a fixed rate. *Id.* at 468. A company policy provided for half pay for travel time. *Id.* at 465. But the contract itself was silent on travel compensation. *Id.* at 469. Because the employees spent a significant portion of their "hours worked" travelling, the Sixth Circuit found the matter to be vital as contemplated by the

6

Kentucky cases.  *See id.* at 468–69.  Thus, the contract was silent on a matter that rendered a right expressed in the contract ambiguous.  *See id.* at 469.

As these decisions demonstrate, silence will only penetrate the parol evidence rule where it pertains to a matter within the scope of rights expressed in the contract.  *See Ranier*, 812 S.W.2d at 156 (agreement that expressly subordinated priority as to a total sum of $125,000 was silent on whether bank should apply payments to the $125,000 portion first); *Caudill*, 178 S.W.2d at 946 (contract that expressly permitted buyer to remove and resell scrap materials embedded in streets silent as to whether buyer was obligated to bear the cost of repairing the streets); *Reynolds Metals Co. v. Barker*, 256 S.W.2d 17, 19 (Ky. 1953) (agreement between metal producer and Ms. Reynolds to develop and market etched aluminum trays that expressly gave Ms. Reynolds a percentage of the profit silent as to who bore the cost of the etching patterns); *Abell*, 715 F. App'x at 469 (contract that expressly required payment for all hours worked "silent or ambiguous as to compensation for travel time, because 'hours worked' does not unambiguously include travel time"); *EQT Prod. Co. v. Magnum Hunter Prod. Inc.*, 768 F. App'x 459, 465 (6th Cir. 2019) (where the scope of the agreement covered "producing and selling oil and gas" and the contract failed to define the word "gas," district court could consider extrinsic evidence to determine "whether components or byproducts of natural gas are included within the term 'gas' . . . ."); *Salmon v. Old Nat'l Bank*, No. 4:08-cv-00116-JHM, 2012 U.S. Dist. LEXIS 133984, at *45–48 (W.D. Ky. Sep. 18, 2012) (where coal mining lease expressly granted HCC the right to perform reclamation activities, which included three seasons of productive crop growth, parties were permitted to introduce extrinsic evidence as to whether the contract permitted HCC to also harvest and "retain control of crop proceeds realized during reclamation.").

By contrast, nothing in the Sponsorship Agreement implies that processing credit card transactions for ticket sales was within the scope of the bargain.  Pivotal agreed to pay seventy-five-thousand dollars per year in exchange for several promotional benefits.  [*See* R. 61-2.]  For example, Pivotal could use Breeders' Cup's trademarks and logos to market itself as the "Official Credit Card Processor of the Breeders' Cup."  *Id.* at 2–3.  Breeders' Cup agreed to identify Pivotal as a presenter during a cocktail hour the week of the Championship races.  *Id.* at 3.  Pivotal's executives even enjoyed eight tickets to the events each year.  *Id.*

Only two portions of the contract could plausibly relate to processing ticket sales.  By prior order, the Court held that the Merchant Agreement clause granted Pivotal the right to process credit card transactions for nomination payments for Breeders' Cup races, the Breeders' Cup Betting Challenge, and donations to Breeders' Cup Charities.  [R. 78 at 10.]  None of these relates to ticket sales.

The only other writing whose scope could include ticket sales is the payment escalation clause.  *See id.* at 4.  Beginning in 2016, Pivotal agreed to increase its annual payment to Breeders' Cup by 3.5 percent if Breeders' Cup sent it at least $5,000,000 in transactions to process.  *Id.*  Pivotal estimates that, had it processed ticket sales for the 2018 World Championship at Churchill Downs, it would have received "$15.38 million in ticket processing volume."  [R. 86 at 6.]  So, it appears that Breeders' Cup could have received an incentive had Pivotal processed the 2018 tickets.

However, Pivotal asks the Court to read an exclusive right to process tickets into the contract's silence.  [R. 58 at 10.]  The contract's inclusion of an incentive for Breeders' Cup to send Pivotal more business is antithetical to the existence of an exclusive right to process ticket sales.  If Pivotal understood itself to be purchasing a guaranteed right to process over fifteen

million dollars per year in transactions in exchange for a fixed fee of seventy-five thousand dollars, it would have had no need to incentivize Breeders' Cup to cross a five-million-dollar threshold. The ticket sales would render the escalation clause superfluous. If the escalation clause implies anything at all, it is that the contract's silence on the matter of ticket sales was an intentional omission. *C.f. Caudill*, 178 S.W.2d at 946 (declining to exclude removal cost from a purchase agreement where the exclusion would render the contract financially unreasonable).

Against this, Pivotal argues for a mechanical rule requiring the consideration of extrinsic evidence whenever a contract fails to mention something. [R. 86 at 3.] Pivotal commits a common error that occurs when a party finds language in a case that, read in isolation, is favorable to his position. Pivotal takes quotes, such as "when a contract is silent with respect to a matter vital to the rights of the parties, a court, in construing it, is necessarily ***compelled*** to resort to a consideration of the surrounding circumstances . . . ." [R. 86 at 4 (quoting *Ranier*, 812 S.W.2d at 156) (emphasis added by Pivotal).]

The attempt is misguided because "the language of an opinion is not always to be parsed as though we were dealing with language of a statute." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979). "Instead . . . opinions dispose of discrete cases and controversies and they must be read with a careful eye to context." *Nat'l Pork Producers Couns. v. Ross*, 143 S. Ct. 1142, 1155 (2023). The clearest example of Pivotal's perversion of a judicial opinion involves *Richardson v. Eastland, Inc.* [R. 86 at 7 (citing 660 S.W.2d 7, 8).] In that case, the Kentucky Supreme Court reconsidered a prior decision regarding contracts releasing tortfeasors from liability. *See Richardson v. Eastland, Inc.*, 660 S.W.2d 7, 8 (discussing *Kingins v. Hurt*, 344 S.W.2d 811 (1961)). Without context, Pivotal quotes one line as binding upon this Court. "Where the contract is silent we ***must*** interpret the intent of the parties." [R. 86 at 7 (quoting *Richardson*,

9

660 S.W. at 8) (emphasis again added by Pivotal).]  But the remainder of the opinion did the opposite.

The appellant in *Richardson* signed a release that discharged her daughter from tort liability but was silent as to other tortfeasors.  *Richardson*, 660 S.W. at 7.  By prior rule, the failure to expressly reserve the right to pursue liability against third parties operated as a release as to all tortfeasors.  *Id.* (citing *Kingins*, 344 S.W.2d at 812).  In reversing this rule, the Kentucky Supreme Court pondered "whether we should abandon a rule that adds to the contract where it is silent." *Id.* Ultimately, the Court decided silence as to third parties should not imply waiver as to third parties.  *Id.* at 8.  The Court reversed *Kingins* in favor of a rule that "[u]nless the release shows on its face that others not mentioned in the release are also released . . . the release shall not be interpreted as providing a defense to a third party not expressly covered." *Id.* at 9.

To see why the cases do not go as far as Pivotal urges, consider the implications of its argument.  Suppose a buyer walks onto a car lot, picks out an old pickup truck, and agrees to pay the seller $10,000.  The next day, the buyer returns to execute the transaction and sees a Ferrari on the lot.  Suddenly, the buyer wishes his contract had included both the pickup and the Ferrari.  After all, a Ferrari for $10,000 would bring the buyer a large profit, and the contract makes no mention whatsoever of Ferraris.  The buyer chooses to sue and claims that he should be able to search for extrinsic evidence that the seller understood their deal to include the Ferrari.  Should the buyer's subjective, post-hoc view that his right to a Ferrari is vital to his contract overcome the parol evidence rule?

No.  And Pivotal's post hoc desire to include processing ticket sales to the World Championships in its Sponsorship Agreement with Breeders' Cup likewise fails.  Under Kentucky law, a party cannot overcome the parol evidence rule by asserting, post hoc, "that the

terms of the agreement fail to state what it intended." *Frear v. P.T.A. Indus.*, 103 S.W.3d 99, 107 (Ky. 2003).

**III**

The Court's decision on Breeders' Cup's motion for summary judgment was made after considering the propriety of Pivotal's argument regarding silence as ambiguity.  In this case, the written agreement shows that silence was exclusion, not an invitation to torture the contract's plain meaning through litigation.  Accordingly, for these reasons, Pivotal's Motion for Reconsideration **[R. 80]** is **DENIED**.

This the 18th day of September 2023.

Gregory F. Van Tatenhove
United States District Judge